**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

EQUITY BANK and
EQUITY BANCSHARES, INC.,

              **Plaintiffs,**

v.                                      **Case No. 22-1081-DDC-GEB**

GAYLYN K. MCGREGOR and
MARINER WEALTH ADVISORS, LLC,

              **Defendants.**

_____

**<u>MEMORANDUM AND ORDER</u>**

Plaintiffs Equity Bank and Equity Bancshares, Inc. bring this action against defendants Gaylyn K. McGregor (a former Equity Bank employee), and Mariner Wealth Advisors, LLC, (Ms. McGregor's new employer). While Ms. McGregor was employed by plaintiffs, she agreed to an employment agreement with non-disclosure, non-interference, and non-solicitation covenants. Plaintiffs assert that Ms. McGregor has breached those covenants because, plaintiffs allege, four of plaintiffs' clients have transferred their accounts to Mariner since Ms. McGregor began working there. Plaintiffs also allege that both Ms. McGregor and Mariner have misappropriated trade secrets and tortiously interfered with a contract and business expectancy.

Plaintiffs move for a temporary restraining order and a preliminary injunction against both defendants (Doc. 5). Specifically, they ask the court to enter a restraining order enforcing the covenants of Ms. McGregor's employment agreement and enjoining both defendants from using plaintiffs' customer information and soliciting or interfering with its actual and prospective customers. This Order addresses only the request for a TRO. The court defers decision on the preliminary injunction request. On the current record, plaintiffs have not shouldered their burden

of establishing the clear and unequivocal need for the extraordinary relief of a TRO.  The court

thus denies the portion of plaintiffs' motion requesting a TRO.  The court explains the reasons

for this ruling, below.[1]

## I.      Background[2]

Plaintiffs are a bank and corporate entity located in Wichita, Kansas.  Doc. 1 at 1 (Compl.

¶¶ 1–2).  From December 2018 to August 2021, Ms. McGregor worked for plaintiffs as their

Director of Trust and Wealth Management.  *Id.* (Compl. ¶ 3).  In this role, Ms. McGregor

"possessed and had access to [plaintiffs'] confidential details of its operations[,]" including

customer contacts, among other things.  *Id.* at 3 (Compl. ¶ 15).  She also had "substantial and

direct contract with [plaintiffs'] prospective and current clients[.]"  *Id.* at 4 (Compl. ¶ 16).

Plaintiffs allege that Ms. McGregor regularly met, emailed, and spoke on the phone with actual

clients about their existing business.  *Id.*  Plaintiffs also allege that Ms. McGregor met with

prospective clients about how plaintiffs' services could meet those clients' needs.  *Id.*

When she began her employment, Ms. McGregor agreed to an employment agreement

with plaintiffs.  *Id.* at 4 (Compl. ¶ 18); *see also* Doc. 1-1 (Employment Agreement).  Three

provisions of that agreement are relevant here.

*First*, Ms. McGregor agreed to a non-disclosure covenant.  Under it, Ms. McGregor

agreed not to disclose plaintiffs' "confidential information concerning . . . business affairs, . . .

---

[1]      When plaintiffs filed their TRO motion, the court was about to enter a 20-day jury trial, which is currently underway.  Given the court's scheduling constraints, it offered the parties several options for proceeding with the TRO, including to proceed on the papers without a hearing.  The parties chose that option, so the court didn't conduct a hearing.  It thus rules plaintiffs' TRO request based on the parties' thorough and well-argued papers.  *See* Docs 5, 10, 11.

[2]      The court takes the following facts from the Verified Complaint, and the declarations submitted with the briefing on this motion.  The court accepts all of plaintiffs' verified allegations as true.

trade secrets, . . . client lists or similar information[.]"  Doc. 1 at 5 (Compl. ¶ 20).  This covenant "survive[s] the expiration or termination of th[e] Employment Agreement for any reason."  *Id.*

*Second*, Ms. McGregor agreed to a non-interference agreement.  In that covenant, Ms. McGregor agreed that, for two years after the end of her employment with plaintiffs, she wouldn't:

> directly or indirectly through any other individual or entity, solicit, entice, persuade or induce any individual or entity to terminate, reduce or refrain from forming, renewing or extending its relationship, whether actual or prospective, with [plaintiffs.]

Doc. 1 at 5 (Compl. ¶¶ 21–22).  Plaintiffs contend that this non-interference covenant extends "to all actual and prospective" customers, not just customers who interacted or did business with Ms. McGregor.  *Id.* at 5–6 (Compl. ¶ 24).  Likewise, plaintiffs allege, the covenant "extends to any current . . . customer or client whether or not they were a customer (actual or prospective) at the time of [Ms.] McGregor's employment."  *Id.* at 6 (Compl. ¶ 25).

*Last*, Ms. McGregor similarly entered a non-solicitation covenant.  Like the non-interference covenant, the non-solicitation covenant provided that, for two years after Ms. McGregor's employment with plaintiffs, she wouldn't:

> directly or indirectly through any other individual or entity, solicit, entice, persuade or induce any individual or business that was a customer of [plaintiffs] during the term of [Ms. McGregor]'s employment with [plaintiffs] to do business with any individual or entity with respect to matters that [plaintiffs] did business or w[ere] attempting to do with such customer either during the term of [Ms. McGregor]'s employment with [plaintiffs] or during the term of this solicitation prohibition.

*Id.* at 5 (Compl. ¶¶ 21–22).

After almost three years working for plaintiffs, Ms. McGregor resigned in late August 2021.  *Id.* at 7 (Compl. ¶ 30); *see also* Doc. 10-1 at 4 (McGregor Decl. ¶¶ 33–34).  Plaintiffs

allege that before Ms. McGregor left her employment, plaintiffs' general counsel reminded Ms. McGregor of her confidentiality and non-solicitation obligations.  Doc. 1 at 7 (Compl. ¶ 32).

Five months later—in January 2022—Ms. McGregor began working as a Senior Wealth Adviser at Mariner Wealth Advisors, LLC, another wealth management business in Wichita, Kansas.  *See id.* at 8 (Compl. ¶ 35); *see also* Doc. 10-1 at 1 (McGregor Decl. ¶ 2).  Plaintiffs allege that just a few weeks after Ms. McGregor began working for Mariner, "a representative of Mariner had provided wealth management marketing materials" to one of plaintiffs' clients, EB.  Doc. 1 at 8 (Compl. ¶ 37).  Plaintiffs allege that EB was a trust and wealth management client during Ms. McGregor's employment by plaintiffs and Ms. McGregor "had direct access to EB during her period of employment[.]"  *Id.*  Shortly after plaintiffs learned about this interaction between one of their clients and a Mariner representative, plaintiffs' general counsel reminded Ms. McGregor "of her non-solicitation and confidentiality obligations and requested her response."  *Id.* (Compl. ¶ 39).

A few days later, another one of plaintiffs' clients, DH, requested a transfer of her account to Mariner.  *Id.* at 8–9 (Compl. ¶ 40).  Plaintiffs allege that, around the same time, DH called Ms. McGregor's old phone number at Equity Bank but hung up when one of plaintiffs' employees told DH that Ms. McGregor no longer worked there.  *Id.*  Plaintiffs' general counsel then demanded that Mariner and Ms. McGregor cease and desist from soliciting their customers.  *Id.* at 9 (Compl. ¶ 41).  Both Mariner and Ms. McGregor denied wrongdoing.  *Id.* (Compl. ¶ 42).

About a week after plaintiffs sent their cease-and-desist letter, the Wichita Business Journal ran a story about Ms. McGregor joining Mariner, titled "Mariner Wealth Advisors adds industry veteran" alongside Ms. McGregor's picture.  *Id.* (Compl. ¶ 43).  Five days after that story ran, another client, NC (who is a family member of DH), also requested to transfer an

account from plaintiffs to Mariner.  *Id.* (Compl. ¶ 44).  And around the same time, joint clients

DW and LW asked plaintiffs to transfer their accounts to Mariner as well.  *Id.* at 10 (Compl. ¶

45).

Plaintiffs allege that, before the loss of these four accounts to Mariner, they never had

lost a client to Mariner.  *Id.* (Compl. ¶ 46).  Plaintiffs also allege that they hadn't lost a client to

any competitor in the previous four months.  *Id.* (Compl. ¶ 47).

## II.    Legal Standard

To secure a TRO, the moving party must establish four things:  (1) the moving party is

substantially likely to succeed on the merits; (2) it will suffer irreparable injury without the TRO;

(3) the threatened injury outweighs the injury the opposing party will suffer if the TRO issues;

and (4) the TRO, if issued, is not adverse to the public interest.  *Winter v. Nat. Res. Def. Council,*

*Inc.*, 555 U.S. 7, 20 (2008) (addressing request for preliminary injunction); *see also Sac & Fox*

*Nation of Mo. v. LaFaver*, 905 F. Supp. 904, 907 (D. Kan. 1995) (explaining that when

"addressing a motion seeking a temporary restraining order," the court "follows the same

procedure as for a preliminary injunction motion").

Preliminary relief—whether in the form of a TRO or a preliminary injunction—"is an

extraordinary remedy, the exception rather than the rule."  *Free the Nipple-Fort Collins v. City of*

*Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019) (preliminary injunction case); *see also*

*Heavy Petroleum Partners, LLC v. Atkins*, No. 6:09-cv-01077-EFM-KMH, 2010 WL 11565423,

at *2 (D. Kan. May 25, 2010) ("A temporary restraining order is an extraordinary remedy that is

an exception rather than the rule, and courts do not grant it as a matter of right.").  Thus, "the

movant must make a 'clear and unequivocal' showing it is entitled" to preliminary relief.  *State*

*v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (quoting *Port City Props. v. Union Pac. R.R. Co.*,

518 F.3d 1186, 1190 (10th Cir. 2008)).  The decision whether to issue "a temporary restraining order or other preliminary injunctive relief is within the sound discretion of the district court." *Sac & Fox Nation*, 905 F. Supp. at 906.

### III.   Analysis

The court denies the request for a TRO.  While plaintiffs have satisfied the irreparable harm requirement, plaintiffs have not—on the current record—demonstrated a substantial likelihood of success on the merits of their claims against defendants.  For that reason, the court denies plaintiffs' request for a TRO.  But, the court grants plaintiffs' request for expedited discovery going forward.  Expedited discovery is justified given plaintiffs' additional request for a preliminary injunction (which the court doesn't decide in this Order).

### A.   Irreparable Harm

Irreparable harm is the touchstone of preliminary relief.  Indeed, our Circuit and our court both have referred to this factor as "the single most important prerequisite" for the issuance of preliminary relief like an injunction or TRO.  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260–61 (10th Cir. 2004) (quotation cleaned up); *see also Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197, 1205 (D. Kan. 2003).  Irreparable harm "'does not readily lend itself to definition.'"  *Dominion Video*, 356 F.3d at 1262 (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)).  And proving irreparable harm is not "'an easy burden to fulfill.'"  *Id.* (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).  "To constitute irreparable harm, an injury must be certain, great, actual, and not theoretical."  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotation cleaned up).  "Irreparable harm is not harm that is merely serious or substantial."  *Id.* (quotation cleaned up).

6

A party seeking interim relief establishes irreparable harm by demonstrating "'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'"  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone*, 321 F.3d at 1258).  "Loss of customers, loss of goodwill, and threats to a business'[s] viability" may "constitute irreparable harm."  *Hill's Pet Nutrition, Inc.*, 258 F. Supp. 2d at 1205 (quotation cleaned up).  But "wholly conclusory statements alone will not constitute irreparable harm."  *TMFS Holdings, LLC v. Capace*, No. 17-2063-JAR-GLR, 2017 WL 495983, at *3 (D. Kan. Feb. 7, 2017).

Plaintiffs' TRO motion devotes just one page to this "single most important prerequisite" of demonstrating irreparable harm.  In that single page, plaintiffs highlight Ms. McGregor's contract, where she agreed that "'her breach of any of the provisions of Section 5 above [the non-disclosure and non-solicitation covenants] will cause irreparable damage to the Bank and that the recovery by the Bank of money damages will not alone constitute an adequate remedy for such breach."  Doc. 5 at 15 (quoting Compl. ¶ 28).  But this part of the agreement doesn't suffice on its own to establish irreparable harm.  Our Circuit has recognized that while "courts have given weight to parties' contractual statements regarding the nature of harm and attendant remedies that will arise as a result of a breach of a contract, they nonetheless characteristically hold that such statements alone are insufficient to support a finding of irreparable harm and an award of injunctive relief."  *Dominion Video*, 356 F.3d at 1266.

But plaintiffs have done more to demonstrate irreparable harm.  When they filed this lawsuit and their TRO request, plaintiffs identified three clients they had lost to Mariner in rapid succession—just a few weeks after Ms. McGregor started working for Mariner.  *See* Doc. 1 at 9–10 (Compl. ¶¶ 44–45).  And so, plaintiffs argue that, if "left unchecked, [d]efendants' conduct

will result in Equity Bank's continued loss of customers and goodwill."  Doc. 5 at 15.  Initially, the court was skeptical that plaintiffs had demonstrated irreparable harm.  After all, plaintiffs lost just three clients rather quickly and hadn't lost another client for several weeks when they filed their TRO request.  It thus was fair to infer, at that time, that the movement had stopped, and irreparable harm was unlikely.  *Cf. Farm Bureau Prop. & Cas. Ins. Co. v. Biggs*, No. 2:20-CV-2558-HLT-KGG, 2021 WL 1348317, at *6 (D. Kan. Feb. 25, 2021) (finding no irreparable harm where "[n]early four months ha[d] passed since" the last of seven customers had cancelled its business with plaintiffs, and plaintiffs had "presented no additional evidence to support the allegation" that they continued to receive cancellation requests "on an almost daily basis").

However, since plaintiffs filed their TRO request, another client has transferred two more accounts to Mariner.  *See* Doc. 11-1 at 1 (Anderson Decl. ¶ 2).  So, plaintiffs now have lost five client accounts in total.  Defendants argue that five lost accounts are insubstantial when compared with Equity Bank's other business, totaling $5.14 billion in assets.  Doc. 10 at 18 n.2.  In response, plaintiffs concede that Equity is an "established bank[.]"  Doc. 11 at 11.  But, they contend, their fledgling trust and wealth management practice is only three years old—and the steady loss of even a few clients threatens its longevity, thus demonstrating irreparable harm.  While it's a close call, the court agrees with plaintiffs.  Assuming plaintiffs could establish a breach of their contractual rights, plaintiffs have shown (but not by much) that the steady loss of five client accounts to Mariner is ongoing and threatens their upstart trust and wealth management practice.  Plaintiffs thus satisfy the irreparable harm requirement.

### B.    Substantial Likelihood of Success on the Merits

Plaintiffs assert three claims against Ms. McGregor and Mariner:  (1) breach of contract against Ms. McGregor only, (2) misappropriation of trade secrets, violating both the Kansas

Uniform Trade Secrets Act, Kan. Stat. Ann. §§ 60-3320–60-3330, and the federal Defend Trade

Secrets Act, 18 U.S.C. § 1836, against both defendants, and (3) tortious interference with

contract and business expectancy against both defendants.[3]  On the current record, plaintiffs

haven't shown a substantial likelihood of success on the merits of any of these claims.  The court

explains this conclusion in the context of each claim, below.

### 1.  Breach of Contract

Plaintiffs allege that Ms. McGregor has breached the non-interference and non-

solicitation covenants of her employment agreement because five of plaintiffs' clients have

transferred their accounts to Mariner since Ms. McGregor began working there.  In response, Ms.

McGregor argues that plaintiffs don't allege any facts suggesting that she personally solicited the

customers who have transferred their accounts.  Nor have plaintiffs alleged that she otherwise

has interfered with their existing business relationships.  Instead, Ms. McGregor contends,

plaintiffs allege merely "upon information and belief" that she has breached her employment

agreement—which doesn't clearly and unequivocally demonstrate a likelihood of success on the

merits.  She's right on both fronts.

To start, plaintiffs' conclusory allegations can't suffice at this stage.  As Ms. McGregor

highlights, the Complaint is rife with conclusory allegations premised "upon information and

belief."  *See, e.g.*, Doc. 1 at 8 (Compl. ¶ 34) ("[U]pon information and belief, defendant

McGregor has used and disclosed certain [customer] information in attempts to interfere with

and solicit away Bank clients for her benefit and for the benefit of Mariner."); *id.* (Compl. ¶ 36)

("On information and belief, defendant Mariner . . . has permitted McGregor to violate her

---

[3]      The court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because
plaintiffs bring a claim under the federal Defend Trade Secrets Act.  The court has supplemental
jurisdiction under 28 U.S.C. § 1367 over plaintiffs' state law claims.

Agreement with Equity by interfering with customer relationships and soliciting customers of the Bank."). But, at the TRO stage, plaintiffs "must do more than substantiate [their] allegations with mere 'information and belief,' especially given the nature of the relief sought." *Biggs*, 2021 WL 1348317, at *5; *see also Biomin Am., Inc. v. Lesaffre Yeast Corp.*, No. 2:20-CV-2019-HLT, 2020 WL 1503475, at *4 (D. Kan. Mar. 30, 2020). Instead, plaintiffs must make a "clear and unequivocal" showing that they are entitled to the extraordinary relief afforded by a TRO. *EPA*, 989 F.3d at 883 (quotation cleaned up).

The specific facts that plaintiffs *do* allege don't clearly and unequivocally demonstrate a substantial likelihood of success on the merits. Accepting all verified allegations as true, five clients have transferred their accounts from plaintiffs to Mariner since Ms. McGregor began working for Mariner. One client, DH, transferred her account to Mariner around the same time she called Ms. McGregor's old number at Equity Bank and hung up when told Ms. McGregor no longer worked there. Doc. 1 at 8–9 (Compl. ¶ 40). Plaintiffs allege that Ms. McGregor had direct access to DH during her employment at Equity Bank, and its fair to infer that Ms. McGregor worked with DH closely enough for DH to call Equity Bank and ask for her there. *See id.* But plaintiffs don't allege that Ms. McGregor solicited DH to transfer her business to Mariner. Indeed, while the timing is murky, by plaintiffs' own verified allegation, DH transferred her business around the same time she was told—by plaintiffs themselves—that Ms. McGregor no longer worked at Equity Bank.

A short time later, another client, NC (who is a family member of DH), also asked to transfer an account from Equity to Mariner. But plaintiffs don't allege that Ms. McGregor solicited NC to transfer to Mariner. And while the circumstances might support an inference of solicitation, there's an equally plausible inference that Ms. McGregor didn't solicit NC. As

defendants highlight, NC requested a transfer to Mariner five days after a Wichita Business Journal article announced Ms. McGregor's move to Mariner.  *See* Doc. 1 at 9 (Compl. ¶¶ 43–44).  And, as plaintiffs allege, NC was DH's family member.  It's thus plausible to infer that NC could've followed DH's lead in transferring accounts from Equity to Mariner.  These equally plausible inferences cast doubt on any inference of solicitation at this stage.  And to make a clear and unequivocal showing to justify a TRO, plaintiffs must come forward with more than verified allegations and inferences "amenable to multiple interpretations."  *Biomin*, 2020 WL 1503475, at *7 (finding that plaintiff hadn't demonstrated likelihood of success on claim that defendant breached non-solicitation covenant where defendant's alleged statements soliciting a customer were "subject to multiple interpretations; some nefarious, and some not").

Finally, two clients (DW and LW) also requested transfer of their joint account to Mariner around the same time as NC and DH transferred their accounts.  And, in their Reply brief, plaintiffs identify another client, PT, who has asked to transfer two accounts to Mariner.  Doc. 11-1 at 1 (Anderson Decl. ¶ 2).  But plaintiffs allege no facts connecting DW, LW, or PT to Ms. McGregor.  Nor do they allege that Ms. McGregor solicited their business.  In fact, plaintiffs never allege that Ms. McGregor ever solicited *any* of plaintiffs' customers.  To be sure, Ms. McGregor confirmed that, since she began working for Mariner, "four individuals who happened to have accounts at Equity have contacted [her] to tell [her] they were transferring their assets to Mariner[.]"  Doc. 10-1 at 5 (McGregor Decl. ¶ 46).  Ms. McGregor declares that she "simply answered the phone" and responded to these clients—but that "they are the ones who transferred their assets" from plaintiffs to Mariner.  *Id.*  While plaintiffs contend these phone calls weren't as benign as Ms. McGregor portrays them, no current evidence or verified factual allegation rebuts

or undermines Ms. McGregor's characterization of her interactions with plaintiffs' former clients.

Also, the only actual verified allegation of solicitation—asserting that in February 2022, "a representative of Mariner had provided wealth management marketing materials to [another] Equity client, EB"—has nothing to do with Ms. McGregor.  Doc. 1 at 8 (Compl. ¶ 37).  Someday, a more robust record may reveal that Ms. McGregor participated in or asserted this alleged solicitation.  And such a showing might implicate Ms. McGregor's agreement that she wouldn't "indirectly" solicit plaintiffs' customers.[4]  But, for now, plaintiffs don't allege that Ms. McGregor was the Mariner representative who presented marketing materials to one of plaintiffs' clients.  And, importantly, plaintiffs don't allege that this client transferred its business to Mariner.

At this stage, plaintiffs' verified allegations present no more than circumstantial evidence requiring several inferences.  And plaintiffs seem to recognize this.  Their TRO motion asserts that their "evidence all *points* to McGregor's violation of the terms of her Agreement[.]"  Doc. 5 at 7 (emphasis added).  This characterization gives up the game.  On the current record, at least, plaintiffs haven't shouldered their heavy burden to make a clear and unequivocal showing of a substantial likelihood of success on the merits of their contract claim.  This isn't to say that, on a more developed record, plaintiffs won't eventually prove their claims against Ms. McGregor.

---

[4]     The court assumes, at this stage, that the employment agreement between plaintiff and Ms. McGregor is enforceable.  Defendants' lead argument in response to the TRO motion is that the agreement is overbroad and thus unreasonable and unenforceable.  But given the court's conclusion that plaintiffs haven't demonstrated a substantial likelihood of success on the merits of its breach of contract claim, the court need not determine whether the employment agreement is enforceable in the first place.  *See Biomin*, 2020 WL 1503475, at *5 n.7 (similarly declining to "reach the enforceability issue" because plaintiffs had "not shown evidence supporting a likelihood of breach").

But, on the record that governs this early stage, plaintiffs haven't shown a substantial likelihood that Ms. McGregor has breached her employment agreement.

## 2. Misappropriation of Trade Secrets

Plaintiffs' claim that both Ms. McGregor and Mariner misappropriated plaintiffs' trade secrets (*i.e.*, their customer information) suffers a similar fate. Even assuming that plaintiffs' customer information is a trade secret protected by federal and Kansas law, plaintiffs offer no evidence or specific factual allegations showing a substantial likelihood that either defendant misappropriated that customer information. Instead, plaintiffs offer the following conclusory allegations in their Complaint:

> 33. By virtue of her former employment with Equity, defendant McGregor *is now in a position* to unfairly compete with the Bank by using or disclosing its Trade Secrets and confidential information to its detriment, by using client goodwill and contacts developed during her employment, and by using Bank customer information for the benefit of the Bank's competitor, Mariner, or for McGregor's own advantage.

> 34. Despite Equity's demands that McGregor and Mariner refrain from interfering with and soliciting Bank relationships and customers, and refrain from using the Bank's confidential information, *upon information and belief*, defendant McGregor has used and disclosed certain such information in attempts to interfere with and solicit away Bank clients for her benefit and for the benefit of Mariner.
> …

> 36. *On information and belief*, defendant Mariner has knowledge of McGregor's contractual and other legal obligations to Equity, but has received and used Equity's confidential information and Trade Secrets to the advantage of Mariner and has permitted McGregor to violate her Agreement with Equity by interfering with customer relationships and soliciting customers of the Bank.

Doc. 1 at 7–8 (Compl. ¶¶ 33–34, 36) (emphases added).

As explained above, at the TRO stage, plaintiffs "must do more than substantiate [their] allegations with mere 'information and belief,' especially given the nature of the relief sought." *Biggs*, 2021 WL 1348317, at *5; *see also Biomin*, 2020 WL 1503475, at *4, 9 (finding plaintiff didn't show substantial likelihood of success because it did "not come forward with facts or

evidence showing that [defendants] did, in fact, use [plaintiff's] trade secrets or other confidential information in soliciting [plaintiff's] customers" and instead merely offered "a conclusory allegation, made on information and belief"). Typically, our court has granted TROs to plaintiffs who have offered some proof that a defendant indeed has misappropriated a trade secret. *See, e.g.*, *TMFS Holdings, LLC*, 2017 WL 495983, at *3 (granting TRO enforcing non-solicitation covenants because plaintiffs' "claims of harm are not merely conclusory—they submitted emails showing [d]efendants communicated with their former clients, and [d]efendants have admitted multiple times that they took with them their clients' names and contact information when they resigned"); *API Ams. Inc. v. Miller*, No. 17-CV-02617-CM-GLR, 2017 WL 11487294, at *5 (D. Kan. Nov. 7, 2017) (granting TRO where plaintiffs alleged that defendant had "removed [plaintiff's] trade secrets and other confidential and proprietary information from [plaintiff's] premises without [plaintiff's] consent").

But here, plaintiffs have offered no similar proof of, or even verified allegations of specific facts showing a substantial likelihood that Ms. McGregor or Mariner misappropriated plaintiffs' customer information. Ms. McGregor testifies in her declaration that when she left her employment, she did not copy, download, write down, or email herself any files, customer information, details of operation, or marketing plans or business information. Doc. 10-1 at 4–5 (McGregor Decl. ¶¶ 35–36). "In other words," Ms. McGregor declares, she "took nothing" from plaintiffs when she left. *Id.* at 5 (McGregor Decl. ¶ 35). Plaintiffs offer nothing to rebut or undermine Ms. McGregor's declaration. Thus, at this stage, plaintiffs fail to show a substantial likelihood of success on the merits of their misappropriation of trade secrets claim. Like the breach of contract claim, plaintiffs ultimately may show a likelihood of success on a different record. But they haven't done so on the current record.

14

### 3.  Tortious Interference

Plaintiffs don't do much to distinguish their tortious interference claim from their breach of contract and misappropriation of trade secret claims.  So, on the current record, plaintiffs fail to establish a likelihood of success on their tortious interference claim for the same reasons discussed above.  But, briefly, plaintiffs allege that defendants intentionally interfered with their customers, even though both defendants knew about Ms. McGregor's employment agreement. Doc. 1 at 8 (Compl. ¶¶ 34–36); *see also* Doc. 5 at 14 ("Defendants have acted to intentionally procure the breach of Equity's contracts, as well as banking and investment relationships with its clients, some of whom are now former clients due to Defendants' actions.").  As explained above, though, plaintiffs haven't alleged any facts that either Mariner or Ms. McGregor intentionally interfered with plaintiffs' existing customers or business relationships.  They only allege that five customers have transferred their accounts to Mariner after Ms. McGregor began working there.  And the only verified factual allegation of potential interference—that a Mariner representative provided marketing materials to one of plaintiffs' clients, EB—doesn't allege any damages.  Plaintiffs don't allege that EB has transferred its account to Mariner or otherwise ended its business with plaintiffs.  Thus, plaintiffs haven't shown a substantial likelihood of success on the merits of their tortious interference claims against either defendant.

### 4.  Conclusion

While plaintiffs have demonstrated that they could establish irreparable harm, they have failed to show a substantial likelihood of success on the merits of their claims.  The court thus need not consider the two remaining factors—whether injury to plaintiffs outweighs the harm to defendants in granting a TRO, or whether declining to issue a TRO would harm the public interest.  As explained above, plaintiffs must make a "clear and unequivocal showing" on all four

requirements for preliminary relief. *EPA*, 989 F.3d at 883 (quotation cleaned up). And, in our Circuit, when "the failure to satisfy one factor is dispositive, a court need not consider the other factors" for preliminary relief. *See id.* at 890 (declining to consider the remaining factors where plaintiffs failed to show irreparable harm).

### C.    Expedited Discovery

On a final note, plaintiffs request limited expedited discovery to aid their request for a preliminary injunction. Specifically, they seek to depose Ms. McGregor and a "Mariner representative[.]" Doc. 5 at 18. They also seek to serve limited document requests about defendants' communications with plaintiffs' customers since Ms. McGregor left her employment with plaintiffs. Defendants oppose this request, arguing that plaintiffs' requests for discovery are vague and overbroad.

The court concludes that plaintiffs are entitled to limited expedited discovery ahead of a hearing for a preliminary injunction. But, the court agrees with defendants that plaintiffs' proposed topics of discovery aren't sufficiently specific. So, while the court generally grants plaintiffs' request for limited expedited discovery, the court directs Magistrate Judge Gwynne E. Birzer to schedule and manage this expedited discovery process.

## IV.    Conclusion

The court denies the portion of plaintiffs Equity Bank and Equity Bancshares, Inc.'s motion (Doc. 5) seeking a temporary restraining order. But, given that plaintiffs have indicated their desire to proceed with their request for a preliminary injunction, the court grants plaintiffs' request for expedited discovery on that aspect of their motion. The court directs counsel for both parties to contact the chambers of Magistrate Judge Gwynne E. Birzer to request a conference for

(1) discussing the details and scope of the expedited limited discovery, and (2) scheduling a preliminary injunction hearing and attendant proceedings.

**IT IS THEREFORE DIRECTED BY THE COURT THAT** the Clerk bifurcate plaintiffs Equity Bank and Equity Bancshares, Inc.'s Motion for a Temporary Restraining Order and Preliminary Injunction, and to Expedite Discovery (Doc. 5) into three parts:  a Motion for Temporary Restraining Order, a Motion for Preliminary Injunction, and a Motion to Expedite Discovery.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiffs' Motion for a Temporary Restraining Order (Doc. 5) is denied.

**IT IS FURTHER ORDERED THAT** plaintiffs' Motion to Expedite Discovery (Doc. 5) is granted.  Therefore, the portion of the motion seeking a preliminary injunction remains pending.

**IT IS SO ORDERED.**

**Dated this 13th day of April, 2022, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**